*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Jaelon D. LEWIS**
Corporal (E-4), U.S. Marine Corps
Appellant

**No. 201900049**

Decided: 8 June 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Jeffrey V. Munoz

Sentence adjudged 4 October 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, confinement for three years, forfeiture of $2,490 pay per month for three years, and a dishonorable discharge.

For Appellant:
*Carol A. Thompson, Esq.*
*Captain Valonne L. Ehrhardt, USMC*

For Appellee:
*Major Kerry E. Friedewald, USMC*
*Lieutenant Kimberly Rios, JAGC, USN*

Senior Judge TANG delivered the opinion of the Court, in which Senior Judge STEPHENS and Judge LAWRENCE joined. Senior Judge STEPHENS filed a separate concurring opinion.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

TANG, Senior Judge:

Appellant was convicted, contrary to his pleas of: one specification of Article 80, UCMJ,[1] and two specifications of Article 120, UCMJ.[2] The Article 80 specification charged him with attempting to commit a sexual act upon Corporal [Cpl] Alpha[3] by penetrating her mouth with his penis while she was incapable of consenting due to impairment by alcohol. He was also convicted of abusive sexual contact and sexual assault, respectively, for causing Cpl Alpha's hand to directly touch his penis and for penetrating her vulva with his penis, while she was incapable of consenting due to impairment by alcohol.[4]

Appellant asserts three assignments of error [AOEs]: (1) the evidence is legally and factually insufficient because Cpl Alpha was not incapable of consent; (2) the military judge erred by refusing to grant the Defense motion to dismiss when the Defense alleged charges were improperly referred

———————————————

[1] 10 U.S.C. § 880 (2012).

[2] 10 U.S.C. § 920 (2012).

[3] This is a pseudonym. By time of trial, Cpl Alpha had been promoted to Sergeant, however this opinion will refer to her by her rank at the time of the incident.

[4] Appellant was acquitted of specifications alleging he committed those same three acts by bodily harm, and he was acquitted of a specification alleging he penetrated her vulva with his penis while she was asleep. The Government also charged three specifications alleging Appellant penetrated her vulva with his tongue by bodily harm, while she was incapable of consenting and while she was asleep; however, the Government dismissed those specifications before trial and moved the court, successfully, to present evidence of that act pursuant to Military Rule of Evidence 413.

because the Article 32, UCMJ, Preliminary Hearing Officer [PHO] failed to produce a detailed report;[5] and (3) the military judge abused his discretion when he admitted evidence pursuant to Military Rule of Evidence 413. We find that the evidence was not factually sufficient and reverse.[6]

## I. BACKGROUND

### A. Night at the Club

Corporal Alpha worked for Appellant at her first duty station in Camp Pendleton. He was the noncommissioned officer in charge of her shop. They shared a solely professional, work relationship. After promoting to corporal, as a peer of Appellant, they maintained a more friendly relationship that some characterized as flirtatious. One witness testified that Cpl Alpha started to flirt with Appellant, tugging on his arm and asking him to take her dancing. And Appellant confided in a friend that he might want to "hook[ ] up" with Cpl Alpha.[7]

Corporal Alpha went to an off-base club with a group of Marines on St. Patrick's Day. She was over 21 years old, but she did not have substantial drinking experience. She drove her car to the club, arriving shortly before midnight. She planned on getting someone else—possibly Appellant—to drive her back to base.

Sometime between midnight and 0100, she drank five tall mixed drinks containing multiple liquors. Appellant was seen walking away from Cpl Alpha after they had been dancing, and Cpl Alpha pulled him back toward her. They left around 0230 to return to base.

---

[5] The PHO found there was no probable cause to support Charge I, Specification 2 or Charge II, Specifications 2, 4, or 7—the offenses that alleged that Cpl Alpha was incapable of consenting. However, he did not attach a detailed written analysis for those conclusions, merely writing "the exhibits show that alcohol did not inhibit [Cpl Alpha's] ability to express non-consent to the [A]ccused's actions." Preliminary Hearing Officer's Report of 20 Apr 2018, Block 23. The convening authority referred all charges to court-martial. Charge II, Specification 7 was dismissed before trial, and Appellant was ultimately convicted of *only* offenses the PHO advised were not supported by probable cause.

[6] This conclusion moots AOEs 2 and 3, and we do not discuss them.

[7] Prosecution Exhibit [Pros. Ex.] 16.

**B. Leaving the Club**

Corporal Alpha left the club with Appellant and another Marine because the person with whom she intended to ride home had already left. As they walked with Cpl Alpha to Appellant's car, she was unsteady on her feet, but was able to walk.[8] She began to have spotty memories. She remembered vomiting as she was getting into Appellant's car; she was sitting inside with the door open, and she vomited onto the ground. Another witness testified that he held her hair while she vomited outside the vehicle but that she never vomited while inside the vehicle during the time he was there. She rode in the backseat, eventually lying down and sleeping.

Corporal Alpha heard Appellant talking with the other Marine about how they would get her on base and into her room without her military identification card [ID]. The barracks rooms had electronic locks, opened by the occupant's military ID. Appellant and the other Marine decided it would be best to take Cpl Alpha to Appellant's room because he had no roommate and therefore a spare bed. Then Appellant dropped off his friend around 0300,[9] leaving only him and Cpl Alpha in the car. This was about 30 minutes after the group left the club. Appellant moved Cpl Alpha to the front seat, although she told him "no" and that she just wanted to sleep in the backseat. She felt dizzy, nauseous, and sleepy. She would later testify this was the most drunk she had ever been in her life.

She testified she next recalled that Appellant picked her up because she "couldn't walk" over the "rocky area" near the barracks entrance.[10] That night, Cpl Alpha was wearing three or four-inch open-toe sandal style heels.[11] To reach her barracks room from the parking lot where Appellant parked, she

---

[8] The witness was asked, "Do you *recall* if [Cpl Alpha] was able to walk on her own?" to which he responded, "Not really. Half-and-half. Like, she was good, and then she wasn't." Record at 632 (emphasis added). The defense counsel then oriented the witness to a date of a prior interview and asked, "You seemed to indicate that she was able to walk or at least you and Corporal Lewis never assisted her; is that correct?"—to which the witness answered, "Yes." *Id.* It is unclear whether the witness agreed he made the prior statement or whether he agreed that neither he nor Appellant had to assist Cpl Alpha to walk.

[9] This is based on a text message Appellant sent at 0302, saying he had just dropped off his friend.

[10] Record at 453.

[11] These are depicted in Pros. Ex. 11.

would have to traverse a gravel pit, consisting of rocks of various sizes up to three inches.

She had somehow moved from Appellant's car to the "rocky area," at which point she could no longer walk. Then he carried her, "as if holding . . . a baby," over the rocky area, then to the second deck.[12] They reached another hallway where they could turn right to reach Cpl Alpha's room or left to reach Appellant's room. She remembered saying "my room," but Appellant took her to his room. She never told Appellant that she could get into her room without her military ID because she had left it unlocked. Their rooms were close to one another, "right around the corner" and not far from where they entered after crossing the rocky area.[13]

## C. Appellant's Room and the First Encounter

The lights were off and the room was dark. He laid her down on the edge of the bed and put a trashcan near the bed in case she had to vomit. Then he got in bed and tried to "cuddle" her by wrapping his arms around her body.[14] He asked, "[Cpl Alpha], is this okay?" and she responded by shaking her head left to right to indicate "no."[15]

She testified she continued to shake her head and, in an effort to prevent him from "cuddling," she rolled onto her back.[16] She rested her hands on her stomach and tried to sleep. When asked why she did not say "no" out loud, she testified that, although she was capable of speaking minutes later, at that moment:

> I couldn't say, no. All I wanted to do is lay down, go to sleep—that was it. If I opened my eyes, if I moved around a lot, if I tried to talk while I was laying down, it made me feel nauseous—sick. So all I really wanted to do was go to sleep.[17]

---

[12] Record at 454.

[13] *Id.* at 455.

[14] *Id.*

[15] *Id.* In court, Cpl Alpha demonstrated this by shaking her head left to right "several times" by the trial counsel's estimate. *Id.*

[16] The trial counsel's question characterized Cpl Alpha's testimony as suggesting that she literally "pushed" Appellant away, but she never testified she did this. She testified that she rolled onto her back in an effort to "push him away." We interpret this pushing in a figurative, as opposed to a literal sense. *See id.* at 455-56.

[17] *Id.* at 455.

She explained further during cross-examination that she could shake her head but that she thought that talking or opening her eyes would make her feel nauseous so she did not say anything. She said she didn't shake her head vigorously ("I didn't shake it to—like, super, like, shaking it") but that she shook her head more than "slightly."[18] When she demonstrated this action in court, she shook her head side to side "several times."[19]

While she was lying on her back with her hands on her stomach, Appellant grabbed her wrist and put it "where his penis is at."[20] She explained that she did not want to touch his penis so, "when he put it there, I just moved my hand back to my stomach."[21] She next testified: "I was in and out of it at that time. So I remember opening my eyes, like, squinting a little bit, and I remember seeing [Appellant] between my legs. He was performing oral sex on me."[22]

By "in and out," she explained she meant, "Like, I was trying to sleep, so there w[ere] moments that I was sleeping that I was just—my eyes were closed and I was just trying to sleep."[23] She testified that when she "woke up,"[24] Appellant's head was between her legs, and because she didn't want him to perform oral sex on her, she "kind of" closed her legs by moving her left leg.[25]

After she moved her leg, he stopped performing oral sex. Then he went to the side of the bed and pulled down his shorts, and Cpl Alpha realized he probably wanted her to perform oral sex on him. She thought Appellant "[m]aybe" wanted to put his penis in her mouth.[26] She did not want to, so she "moved" her head "to the left."[27] Then he "grab[bed]" her head with a cupping

---

[18] *Id.* at 487.

[19] *Id.* at 459.

[20] *Id.* at 456.

[21] *Id.*

[22] *Id.* Appellant was charged with this offense but the specifications were dismissed before trial. The evidence was admitted pursuant to Military Rule of Evidence 413.

[23] *Id.*

[24] This was the trial counsel's question.

[25] *Id.* at 457.

[26] *Id.*

[27] *Id.*

motion on her forehead and moved it back, but he did not penetrate her mouth with his penis.[28] She moved her head back to the left.

She explained that she did not say anything because she was "still very, very intoxicated" and she "was just laying there" and was "still nauseous" and "still dizzy."[29] She testified at trial that, at that moment, she had felt like she "couldn't get up."[30] At that point, Appellant said, "[Cpl Alpha], you are sending me mixed signals. I don't want to get in trouble."[31] She did not say anything in response. He "grabbed" her by her arms and "sat" her up.[32] Then she got up from the bed on her own and asked him, "[C]an you check?" referring to the hallway.[33] She testified that at that moment, she was "just standing there with [her] eyes closed" while Appellant checked the hallway.[34] It was against the barracks policy to have visitors in any Marine's barracks room after 2200. Corporal Alpha knew she was pending formal counseling, which would become part of her service record, for recently failing to report her roommate's previous violation of this rule.[35] A second infraction would compound her troubles. Appellant responded, "S[***]t," and Cpl Alpha did not leave, apparently taking his exclamation to mean that someone was in the hallway and she could not leave without being seen.[36]

She testified Appellant closed the door then turned her around toward the bed. He said, "Sleep on the bed. I'll sleep on the chairs."[37] She did not leave but returned to Appellant's bed and went to sleep. She explained that she

---

[28] *Id.* Corporal Alpha was not asked and did not testify whether Appellant ever moved his penis toward her face.

[29] *Id.* at 458.

[30] *Id.* at 503.

[31] *Id.* at 458.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 504.

[35] Her roommate was going to face nonjudicial punishment for allowing her boyfriend to stay in their room.

[36] During cross-examination, she suggested she would have been happy if another Marine saw her and claimed that she stayed in Appellant's room because she wasn't "really capable" of walking back to her room, not because she wanted to avoid being seen. *Id.* at 492.

[37] *Id.* at 459.

went to sleep on Appellant's bed because she felt better when she was lying down.

**D. Second Encounter**

Corporal Alpha next remembers lying on her side in the bed when she noticed Appellant "tugging" on her shorts and trying to pull them down.[38] It was still dark outside and in the room. He was trying to "cuddle" her while she was lying on her side and he was lying on his side behind her, like the "big spoon."[39] She testified he said, "[Cpl Alpha], this is okay,"[40] and that she shook her head side to side to indicate "no"; however on cross-examination, when discussing this same act, Cpl Alpha testified that Appellant actually asked *"is this* okay."[41] Then she rolled over from her side to her back, which resulted in her lying on her back on top of Appellant with her shoulder blades on top of his arm. She rolled over in an effort to figuratively push him off. He grabbed her wrist and "moved it to his penis," and she moved it back because she "didn't want [her] hand next to his penis."[42]

She testified about what happened next: "After that, he, kind of, like, rolled me over on top of him, but I wasn't fully on top of him."[43] His legs were in a V-shape, apart, and she was lying on top of him with both of her legs over one of his.[44] He then moved one of his legs in between hers, resulting in her "just laying there on top of him, like, heavy weight . . . just laying there," hanging over his shoulder.[45] At that point, she was "straddling" him with both of her legs outside of his.[46] While her eyes were closed, he somehow penetrated her with his penis and she heard him moan. She said, "I don't

---

[38] *Id.*

[39] *Id.* at 494.

[40] *Id.* at 459.

[41] *Id.* at 494 (emphasis added).

[42] *Id.* at 460.

[43] *Id.*

[44] During cross-examination, Cpl Alpha described this differently, saying that one of his legs was between both of her legs before he repositioned them. *See id.* at 496.

[45] *Id.* at 461.

[46] *Id.* at 496. The Defense characterized this position as "straddling," and Cpl Alpha agreed, saying, "Yes." *Id.*

know how exactly . . . he penetrated me."[47] She explained that she was unable to move because she was "still dizzy, still nauseous" and all she wanted to do was to sleep.[48] She stated she does not know whether she could have moved at that point. She continued, "And I was just on top of him. And that was it."[49] At no point did she support her own 120-pound body weight. She explained that she was just like a "limp rag doll."[50] She didn't know whether Appellant was holding her arms or her body or lifting her hips. She did not know how long sex lasted in this position.

At some point, Appellant "rolled" her over onto her back.[51] She could not explain how he accomplished that, but explained that he "rolled [her] over."[52] But once she was on her back, he continued to penetrate her. She testified while this was happening, she remembers "squinting" her eyes and opening them "a little bit" before she fell asleep while he was still penetrating her.[53] She could not recall how intercourse ended.

### E. The Next Morning

She woke up some time later, fully dressed. By then, it was light out. She could not identify the amount of time that had passed since her last memory of intercourse and the time she awoke. She acknowledged that it could have been as little as 10 minutes. She got up, grabbed her shoes and asked Appellant to check the hallway. Appellant said another Marine was within view. She did not leave at that moment, but waited until the hallway was clear. Appellant hugged her; but she did not hug him back. Then she walked the short distance to her room, unassisted. She still felt intoxicated, but less than before.

Back in her room, she used the bathroom. She noticed "liquids" in her underwear.[54] At 0800 she texted Appellant asking him, "[W]hatever hap-

---

[47] *Id.* at 497.

[48] *Id.* at 461.

[49] *Id.*

[50] *Id.* at 497.

[51] *Id.* at 498.

[52] *Id.*

[53] *Id.* at 461.

[54] *Id.* at 463.

pened. Let it stay between us please."[55] Appellant agreed, asked whether she was "good tho [sic]," to which she responded, "Yeah I'm just waking up."[56] Appellant asked, "[Y]ou know what we did right? And your [sic] ok with it right?" but Cpl Alpha did not respond.[57]

She began remembering what happened and started to cry. She texted her best friend and also made a video message for her where she was crying and twice said, "I was unconscious."[58] Instead of sending the message to just her friend, she testified that she inadvertently sent the video message to all of her contacts in that particular social media application. She saved the video and later provided it to Naval Criminal Investigative Service [NCIS] special agents, and the video was admitted as a prosecution exhibit. Later, at trial, Cpl Alpha explained that when she said she was "unconscious," she meant that she was "in and out of it," asleep at some times and could not remember other times.[59]

Corporal Alpha texted her best friend, asking, "Whats [sic] the name of the person you go talk to after you get taped of [sic] abused,"[60] ostensibly asking for sexual assault prevention and response procedures. She sent this text five minutes after Appellant asked, "[Y]ou know what we did, right?"[61] Her best friend called Cpl Alpha, who was crying. The best friend could not understand Cpl Alpha so she and her husband went to see her. They brought her to their house where Cpl Alpha showered and slept most of the day. She was hungover and she vomited. Then she returned to the barracks.

A fellow Marine drove Cpl Alpha from her best friend's house back to the barracks at Cpl Alpha's request. During the drive, Cpl Alpha was upset. She

---

[55] Pros. Ex. 4 at 14.

[56] *Id.*

[57] *Id.* Hours later, Appellant texted that he had found Cpl Alpha's military ID. Corporal Alpha asked Appellant to give it to another Marine to give to her. When Appellant again asked, "You good tho [sic]?" Cpl Alpha again ignored him. *Id.* Another witness testified that Appellant gave Cpl Alpha's belongings to him, and he in turn returned them to Cpl Alpha. It was unclear when Appellant came into possession of Cpl Alpha's military ID, or whether he had it before returning her to the barracks or he received it the next morning after she left his room.

[58] *Id.* at 465.

[59] *Id.* at 470.

[60] Pros. Ex. 12.

[61] *See* Pros. Ex. 12 at 1, Pros. Ex. 4 at 14.

said, "I think I said no. I think I said no."[62] Then she said "I'm pretty sure I said no."[63]

At the urging of another friend, she called her mentor and ultimately made an unrestricted report of sexual assault. She submitted to a sexual assault forensic examination [SAFE] and reported her allegation to special agents of NCIS. She provided her phone to NCIS special agents, although she told them she had deleted all text conversations with Appellant.

That night, after receiving no responses to his texts, Appellant texted:

> Hey. Can we talk[?] [Another Marine] can be with us too if you don't feel comfortable. But we really gotta talk. I admit I was wrong for letting you get on top of me and allowing stuff to happen but you were the one who got on top. And when you texted me saying "Whatever happened. Let it stay between us please. Yeah or nah?" I seriously thought you knew what was going on.

> So please can we talk or if you want me to completely leave you alone ok I understand.[64]

## F. Investigation and Trial

The Government preferred charges against Appellant, alleging the same acts under a bodily harm theory and under the theory that Cpl Alpha was incapable of consenting. The Government also charged Appellant with penetrating Cpl Alpha's vulva while she was sleeping and penetrating her vulva with his tongue, alleging three theories of criminality. An Article 32, UCMJ, preliminary hearing was conducted. The PHO determined that there was not probable cause to believe Appellant committed the offenses under the theory that Cpl Alpha was incapable of consenting. Nevertheless, the convening authority referred all charges to general court-martial, dismissed some charges before trial, and the members convicted solely on offenses alleging that Cpl Alpha was incapable of consenting. At trial, the Government and Defense presented evidence and witnesses who relayed the facts summarized above. Further evidence is summarized below.

---

[62] Record at 704.

[63] *Id.*

[64] Pros. Ex. 4 at 15.

*1. Defense cross-examination of Corporal Alpha*

Corporal Alpha acknowledged that, although she thought she would become ill if she spoke, she was able to speak both before and after the times she said she was only able to shake her head "no." She agreed she could not be sure whether Appellant saw her shake her head "no" in the darkness of the room in the middle of the night. She agreed that after Appellant said he was getting "mixed signals," he stopped and went to sleep in his chair.

At trial, the Defense established that Cpl Alpha made some inconsistent statements to her friends in the days after the assault. When Cpl Alpha learned that Appellant was telling others that Cpl Alpha was on top of him during sex, Cpl Alpha told her best friend that was "bull[***]t."[65] She also told her friends she believed she was pregnant, even though she had begun to menstruate on the day of the alleged assault.

The defense counsel asked Cpl Alpha whether it was possible she voluntarily moved her hand and slid it down into Appellant's shorts. She replied, "No, I don't think so," and "I wouldn't do that."[66] She later stated that she did not do that. She also said she would not have done that while sober and that she was only trying to sleep, so she would not have moved her hands away from her stomach because she holds her hands on her stomach when she sleeps.

The Defense also presented two prior inconsistent statements by Cpl Alpha. She had previously said she asked Appellant to check the hallway because she did not want to get in trouble. However, in court she testified that she would have welcomed getting in trouble because she would have preferred to leave rather than stay in Appellant's room. In court, she said she reflexively asked Appellant to check the hallway out of habit. In the second impeachment, the Defense presented Cpl Alpha's prior statement stating that she would have walked back to her own barracks room if there had been no one in the hallway the first time Appellant checked. At trial, she testified that she was incapable of walking.

During cross-examination of Cpl Alpha's best friend, the Defense asked about a text message Cpl Alpha sent. At some point, Cpl Alpha told her best friend that if she "let it go," the staff noncommissioned officers would be

---

[65] Record at 506.

[66] *Id.* at 495.

disappointed in her, apparently referring to her perceived need to make an unrestricted report of sexual assault.[67]

### 2. Evidence presented at trial

At trial, the Government entered additional statements from Appellant, including:

(1) A social media post he sent shortly after he awoke sleeping in his chair, at 0423, in which he wrote "I miss my bed [sad crying emojis] hate having to sleep in my chair cuz SOMEBODY can't handle themselves and I have to give up my bed. Woke up with the worst backache ever."[68]

(2) Messages Appellant sent to a female friend,[69] including "Love playing babysitter" sent around 0230, before Appellant returned to base. Then, after Cpl Alpha had left his room and this friend asked about Appellant's night, he wrote "Long story short a Marine from my job went out with us and she got obliterated drunk. She got kicked out, threw up on me and Sean, threw up on my car, threw up on my shoes, threw up inside the car, and threw up on me again. And she lost her room key so I let her crash in my room and I slept on the chair."[70]

(3) Messages Appellant sent to the male Marine who rode with Appellant and Cpl Alpha back to base, all of which were sent after 0700 that morning: "She painted all over me and my floor,"[71] "I wanna die." When that Marine said, "She seemed good when I left lol," Appellant replied, "Nah she started throwing up again moment I left the parking lot. All over my back seat then got to the barracks. I picked her up and she puked on me again and duty was coming so I just took her to my room she puked again on my floor AND MY OTHER PAIR OF JORDANS!!! I was so f[***]ing pissed I let her crash on my bed and I slept on the chair keeping the bucket near her ass."[72] He also

---

[67] *Id.* at 674.

[68] Pros. Ex. 9.

[69] At the time of the incident, this female friend was a potential romantic prospect, but had not yet begun to date Appellant, according to one witness.

[70] Pros. Ex. 13.

[71] The recipient of this message testified he believed this referred to vomiting.

[72] Pros. Ex. 15 at 1.

wrote, "I'm still pissed. I wanted to punch her ass in her sleep. I'm on my way to the car wash right now tho it smells like liquor vomit in my car."[73]

(4) A text message conversation with a male Marine. Appellant apparently told this friend that he might want to "hook[ ] up" with Cpl Alpha on the night of the incident. The following exchange occurred:

Friend:    And yeah man I'm worried if u did something she'd snitch and if u hooked up she'd be under [their Platoon Corporal's] advice to f[***]k you over?

Friend:    U need that consent on [sic] writing or recorded the way these snakes are.

Appellant:    That's a possibility. But you never know[.] And even if I hooked up with her I could just ask for consent.

Appellant:    And Ima record it on my phone lol.[74]

The Government presented the testimony of one of Appellant's friends who said Appellant "briefly" told him what had happened with Cpl Alpha, including that he had had intercourse with her.[75]

During closing arguments, the Defense argued Appellant exaggerated Cpl Alpha's intoxication, falsely claiming she vomited more times than she did because he did not want others to think they had had sex. The Defense argued Appellant did this because he wanted to honor Cpl Alpha's request not to tell anyone they had had sex.

Although Cpl Alpha could not verify whether she vomited inside Appellant's vehicle, the Government presented evidence that Appellant conducted Internet searches later that day for car shampoo and carpet cleaner.

Forensic evidence presented at trial suggested that Appellant penetrated Cpl Alpha's vulva and did not likely ejaculate.

*3. Expert testimony*

The Defense presented the testimony of an expert psychiatrist, an active duty Navy doctor, who testified about the effects of alcohol on the human body, especially its effects on memory. Alcohol is a disinhibitor and is known

---

[73] *Id.*

[74] Pros. Ex. 16.

[75] Record at 647.

to "decrease sexual inhibitions."[76] He testified that vomiting serves to eliminate alcohol from the body and can make an intoxicated person feel better. He also testified that memory is "dynamic and fluid."[77] According to the expert, a person's memories can be affected by their emotions and can be selectively saved or rejected depending on their "consistency with [the person's] values and truths."[78] He added that trauma can reinforce memories—true or otherwise, as could repetition.

The expert described the effects of alcohol on memory formation and reliability and a person's ability to consolidate memories. In a "classic blackout," a "key component of memory formation is shut off."[79] A person experiencing classic blackout can "look[ ] completely normal" and engage in "normal activities" but have no recollection of what they did.[80] They lack recollection because their memories were "never recorded" because they were "never formed."[81]

People do not know they are experiencing a blackout, and people interacting with others who are experiencing a blackout may be unaware that the other will later lack memory for events that took place. A person experiencing a blackout will likely show other signs of extreme intoxication. The classic blackout can consist of a fragmentary (remembering pieces) or an en bloc (total) blackout. The expert noted there were even cases in which persons experiencing a blackout appeared in control of their actions and were able to complete high functioning tasks such as flying jets and performing surgeries. They can have the "cognitive ability to appreciate what they are doing" and are capable of acting with volition and intention.[82] They can still agree to have sex and participate in sexual acts. The mere fact that a person experiences a blackout does not mean that the person is unable to consent. The expert explained that unless a person is "obtunded," or "almost comatose,"

---

[76] *Id.* at 743.

[77] *Id.* at 737.

[78] *Id.* at 738.

[79] *Id.* at 739.

[80] *Id.*

[81] *Id.* at 741.

[82] *Id.* at 743.

they have the ability to consent, meaning they would have the capability to knowingly, intentionally, and voluntarily engage in sexual activity.[83]

Rapid consumption of high-proof liquor is correlated with blackouts. People who have experienced blackouts commonly believe they must have been unconscious or asleep when, in fact, they were awake but lack memories because they were experiencing a blackout. People cannot remember "the point at which [they] fall asleep."[84] When a person has experienced a fragmentary blackout, their brain tends to want to "fill . . . in" the gaps in memory, typically with a narrative consistent with the person's values and self-beliefs.[85]

The expert also explained that intoxication can cause myopia, or short-sightedness, in which the person can only focus on the most immediate challenges or events. A person experiencing myopia may be able to remember an act, but not how that act occurred. The expert explained: "If somebody is in a situation that is more stimulating, that's going to increase their attention, their focus—increase the likelihood that they may experience memories."[86] The person would not appear any more alert, but "internally, their alertness and their internal stimulation has increased to the point that they had enough resources online . . . to encode and process memories."[87] The expert opined that it would make sense for someone to recall sex but not recall any role they played in initiating or participating in the act.

## II. DISCUSSION

### A. Standard of Review

We are mandated to exercise a "unique statutory function" under Article 66, UCMJ.[88] We must conduct a de novo review and may "affirm only such findings of guilty" as we find are "correct in law and fact."[89]

---

[83] The expert further defined "obtunded" as "severely sedated, minimally responsive to the environment," and "a step above coma." *Id.* at 768.

[84] *Id.* at 761.

[85] *Id.* at 745.

[86] *Id.* at 764.

[87] *Id.*

[88] *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [Service court of appeals] are themselves convinced of the [A]ccused's guilt beyond a reasonable doubt."[90] We must take "a fresh, impartial look at the evidence," and we need not give "deference to the decision of the trial court . . . beyond the admonition in Article 66, UCMJ, to take into account the fact that the trial court saw and heard the witnesses."[91]

"By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt."[92]

Having carefully considered the evidence presented at trial, and taking into account "the fact that the trial court saw and heard the witnesses," we are not convinced of Appellant's guilt beyond a reasonable doubt.[93]

## B. Elements of the Offenses and Defenses

The elements of Charge I, Specification 2, attempted sexual assault are:

(1) that Appellant attempted to penetrate Cpl Alpha's mouth with his penis;

(2) that he did so with specific intent to commit the offense of sexual assault while Cpl Alpha was incapable of consenting;

(3) that the act amounted to more than mere preparation and constituted a substantial step; and

(4) that the act apparently tended to bring about the commission of the offense in that the act apparently would have resulted in the commission of

---

[89] Art. 66, UCMJ (2012); *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002).

[90] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[91] *Washington*, 57 M.J. at 399.

[92] *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994) (affirming propriety of the military judge's definition of reasonable doubt).

[93] *Washington*, 57 M.J. at 399.

the offense but for Cpl Alpha's act of turning her head away, which prevented completion of the offense.

The underlying attempted offense has the following elements:

(1) that Appellant penetrated Cpl Alpha's mouth;

(2) that he did so while she was incapable of consenting; and

(3) that he knew or reasonably should have known that she was incapable of consenting.

For this offense, as a specific intent offense, Appellant would have to actually *know* that Cpl Alpha was incapable of consenting, and any belief—even an unreasonable mistaken belief—that Cpl Alpha was capable of consenting would negate this element and constitute a defense.

The elements of Charge II, Specification 2, abusive sexual contact were:

(1) that Appellant committed sexual contact by causing Cpl Alpha to directly touch his genitalia;

(2) that he did so when Cpl Alpha was incapable of consenting;

(3) that he knew or reasonably should have known that she was incapable of consenting; and

(4) that he acted with the intent to gratify his sexual desires.

The defense of mistake of fact as to Cpl Alpha's capacity to consent applies.[94]

The elements of Charge II, Specification 4, sexual assault while Cpl Alpha was incapable of consenting were:

(1) that Appellant caused penetration of Cpl Alpha's vulva, however slight;

(2) that he did so when Cpl Alpha was incapable of consenting;

(3) that he knew or reasonably should have known that Cpl Alpha was incapable of consenting.

---

[94] For this specification, the military judge instructed that it was a defense if Appellant mistakenly believed that Cpl Alpha was capable of consent, even if his mistake had been unreasonable. The military judge should have instructed that Appellant's mistake had to be *reasonable* in order to negate the part of the element that he "reasonably should have known" of Cpl Alpha's incapacity. In conducting our factual sufficiency review, we apply the correct standard.

The defense of mistake of fact as to capacity to consent and voluntary intoxication apply. For all three offenses, consent is relevant to determining whether the Government met its burden of proving the elements of the offenses.

We are called upon to independently determine whether we are convinced beyond a reasonable doubt of Appellant's guilt. But reasonable doubt is not intended to be fanciful, speculative, or ingenious doubt or conjecture, but an honest and actual doubt suggested by the material evidence or lack of it in the case. It is a genuine misgiving caused by insufficiency of proof of guilt. Proof beyond a reasonable doubt is proof that leaves us firmly convinced of the Appellant's guilt. If we believe there is a "real possibility" that he is not guilty, there is reasonable doubt, and we cannot affirm Appellant's conviction.

### 1. United States v. Pease

For all three offenses, the Government had to prove beyond a reasonable doubt that Cpl Alpha was incapable of consenting. Our decision turns on this element.

Consent is a "freely given agreement to the conduct at issue by a competent person."[95] A sleeping, unconscious, or incompetent person cannot consent.[96] The members acquitted Appellant of committing sexual assault while Cpl Alpha was asleep, and we do not find evidence that she was unconscious.[97] Therefore, we must consider whether Cpl Alpha was incompetent.

In *United States v. Pease,* the Court of Appeals for the Armed Forces [CAAF] affirmed, with one modification, this Court's definition of the terms "competent person," "incompetent," and "incapable of consenting."[98] A "competent person" is one who "possesses the physical and mental ability to

---

[95] Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 920(g)(8)(A) (2012).

[96] Article 120(g)(8)(B), UCMJ.

[97] Corporal Alpha testified that she lacked memory of what happened after Appellant penetrated her vulva while she was on her back. She characterized this as having fallen asleep during sex. Whether Cpl Alpha fell asleep or simply lacked memory because she was experiencing a fragmentary blackout, we do not find that she lost consciousness.

[98] 75 M.J. 180 (C.A.A.F. 2016).

consent."[99] An "incompetent person" is one "who lacks either the mental or physical ability to consent" for a statutorily enumerated reason—in this case intoxication by alcohol.[100] "Incapable of consenting" means "lack[ing] the cognitive ability to appreciate the sexual conduct in question or [lacking] the physical or mental ability to make or communicate a decision about whether they agreed to the conduct."[101] If Cpl Alpha met any one of those three standards, she was incapable of consent.

The Military Judge's Benchbook contains this standard instruction which restates the *Pease* standard as follows:

> A "competent person" is a person who possesses the physical and mental ability to consent.
>
> An "incompetent person" is a person who lacks either the mental or physical ability to consent because she is: (1) asleep or unconscious; (2) impaired by a drug, intoxicant, or other similar substance; or (3) suffering from a mental disease or defect or a physical disability.
>
> To be able to freely make an agreement, a person must first possess the cognitive ability to appreciate the nature of the conduct in question and then possess the mental and physical ability to make and to communicate a decision regarding that conduct to the other person. However, if the person has the ability to appreciate the conduct and communicate lack of consent, but does not do so out of fear or because of some other external influence counteracting voluntariness, the sexual conduct is not voluntary.
>
> A person is "incapable of consenting" when she lacks the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make or to communicate a decision about whether she agrees to the conduct.[102]

---

[99] *Id.* at 185.

[100] *Id.*

[101] *Id.* at 185-86 (alterations in original).

[102] *Military Judge's Benchbook*, Dep't of the Army Pamphlet 27-9 at 3-45-14, note 13 (10 Sep 2014, incorporating changes through April 2018) (modified to include only feminine pronoun).

This instruction is correct, and we will apply it to our review. The CAAF has further interpreted the standard set forth in *Pease.* In *United States v. Bailey,* the court held that the *Pease* standard does not require that the victim was "completely unable" to communicate.[103]

### 2. Cognitive ability to appreciate the sexual conduct in question

The Government argues that Cpl Alpha lacked the cognitive ability to appreciate the sexual conduct, and that she had only a "retrospective understanding" and appreciation of the conduct after she awoke later that morning.[104] The operative time for determining Cpl Alpha's capacity to consent was during the act in question. The fact that Cpl Alpha may not remember all aspects of her encounter does not mean that she necessarily lacked capacity to consent.[105]

For the attempted act of fellatio, according to her own testimony, Cpl Alpha was awake and aware of what was happening. She understood that Appellant was removing his shorts and she interpreted that as meaning he was asking her to perform oral sex.[106] In fact, she testified that she twice moved her head to avoid such activity. For the sexual contact between her hand and his penis, she was aware that her hand was on his penis and immediately reacted by removing her hand. Finally, Cpl Alpha testified that she knew Appellant was penetrating her vagina with his penis. She was awake and aware of what was happening when, according to her testimony, he rolled her body on top of his and penetrated her while she was on top of him. She was likewise aware of what was happening when he penetrated her while she was lying on her back. Even if Cpl Alpha lacks memory of how the act *ended*—either because of an alcohol-induced blackout or because she fell

---

[103] *United States v. Bailey*, 77 M.J. 11, 13 (C.A.A.F. 2017) (affirming military judge's refusal to instruct that "'[i]ncapable' means a complete and total mental impairment . . . which rendered the alleged victim completely unable to appraise the nature of the sexual conduct at issue, completely unable to physically communicate unwillingness to engage in the sexual conduct at issue, or otherwise completely unable to communicate competent decisions").

[104] Appellee's Answer of 18 Nov 2019 at 22.

[105] Corporal Alpha remembers all aspects of the two sexual encounters except that she said she came to realize Appellant was performing oral sex on her, and she testified that she believes she fell asleep while she was on her back and Appellant was penetrating her.

[106] Also, on cross-examination, Cpl Alpha agreed that she understood what was happening. Record at 503 ("I guess I knew something was happening.").

asleep during the sex act—she was not unconscious, and the members acquitted Appellant of committing this act while she was asleep. Further-more, she was aware of the act as it was beginning, both when she was on top and when Appellant was on top of her.

The evidence clearly indicates Cpl Alpha had the cognitive ability to ap-preciate the sexual conduct covered by all three offenses. During the three acts for which Appellant was convicted, Cpl Alpha was awake, knew what was happening, formed a memory of what was happening, and was able to recall that memory shortly after waking up later that same morning.

*3. Physical or mental ability to make or to communicate a decision*

a. Sexual contact and attempted oral sex

The Government argues Cpl Alpha lacked the *mental ability* to communi-cate her lack of consent to the sexual contacts and attempted oral sex act. It asserts that Cpl Alpha "could not formulate verbal responses," and could only shake her head "no" or remove her hand.[107] The Government also writes, "Although [Cpl Alpha] had the physical ability—albeit minimal—to show her unwillingness to engage in the conduct by moving away, her intoxication impeded her mental ability to verbally communicate her lack of consent."[108]

Appellant twice put Cpl Alpha's hand on his penis—once upon first enter-ing his barracks room and again after he got into bed with her after he awoke. In the first instance, Cpl Alpha was not asleep. She was awake, aware of what was happening, decided she did not want to touch Appellant's penis, and pulled her hand away. By her physical act, she showed she was able to make and communicate a lack of consent.[109]

The second time Appellant put Cpl Alpha's hand on his penis, she was also awake. She knew what was happening, and again she was able to make a decision and communicate a lack of consent by removing her hand. The Government argues that, although Cpl Alpha had the physical ability to

---

[107] Appellee's Answer at 19.

[108] *Id.*

[109] Since the members acquitted Appellant of sexual contact by bodily harm—i.e., nonconsensual sexual contact—the question of whether Cpl Alpha actually consented to the contact is not for this Court to consider. Although consent is relevant to determining whether the Government met its burden to prove the elements, our analysis turns on the element of the offenses Appellant was convicted of, which requires proof that Cpl Alpha was *incapable* of consenting.

communicate, she lacked the mental ability to do so. We disagree. The very act of removing her hand—in order to cease the sexual contact she found offensive—demonstrates that she had the mental ability to make and communicate a decision about what she wanted to do. By her testimony, it was a choice to remove her hand both times because she did not want to touch Appellant's penis. These were not acts of automatism or reflex. As described by Cpl Alpha herself, these acts were the product of thought, followed by intentional physical action, refuting the government's claim that Cpl Alpha lacked the mental ability to communicate a decision about whether she consented.[110] Corporal Alpha also testified that she communicated her lack of consent by shaking her head "no" to indicate she did not want to "cuddle" with Appellant, and she rolled over. And before the first incident, she indicated she did not want oral sex from Appellant by closing her legs and did not want to give oral sex to Appellant by moving her head to avoid fellatio.

The Government's assertion that Cpl Alpha was unable to "formulate verbal responses" is further contradicted by other evidence. During the first sexual interaction, Cpl Alpha had recently been able to talk when she told Appellant "my room." Then, after Appellant told her she was giving him "mixed signals" and he stopped all sexual contact, Cpl Alpha stood up without assistance and asked Appellant to check the hallway. These words and actions demonstrate she had the mental ability to form coherent thoughts and was able to speak to convey those thoughts shortly before and shortly after both acts of sexual contact.

As for the attempted act of oral sex, we reach the same conclusion based on the same logic. This act occurred once, shortly after entering Appellant's room. Shortly before and shortly after the attempted act, Cpl Alpha was capable of speaking.[111] Corporal Alpha testified that she knew what Appellant wanted, decided that she did not want to perform oral sex on him, so she turned her head away. She had the physical ability to communicate a lack of consent, and that physical act was the product of a mental decision that she

---

[110] The fact that Appellant should have confirmed Cpl Alpha's consent *before* causing the sexual contacts does not change our treatment of the element of *capacity* to consent.

[111] Corporal Alpha testified that she "couldn't talk" when Appellant appeared to motion for her to perform oral sex, but she continued by explaining that she just wanted to sleep because she was drunk. *Id.* at 503. But by her own testimony, she was able to talk shortly before and after this moment.

did not want to perform oral sex. Therefore, she had the mental ability to decide whether she wanted to engage in the sexual conduct and to communicate her decision. We are not convinced beyond a reasonable doubt that Cpl Alpha lacked the physical or mental ability to decide whether to participate in sexual acts and to communicate her choice.[112]

b. Intercourse

The Government argues Cpl Alpha lacked both the physical and mental ability to make or communicate a decision about whether she agreed to the act of intercourse because she was "dizzy and nauseous."[113] It asserts she was "too drunk to physically rebuff him or explicitly tell him 'no.'"[114]

This act occurred once, in two positions, during the second sexual encounter after both Appellant and Cpl Alpha woke up in the early morning hours. Corporal Alpha testified that she felt nauseous and could not tell Appellant "no." However, Cpl Alpha testified that just before this sex act, she had shaken her head "no" when Appellant tried to "cuddle" her, moved onto her back, and removed her hand when he put it on his penis. These acts, coupled with Cpl Alpha's ability to speak before and shortly after the first encounter as described above, make us unconvinced, beyond a reasonable doubt, that she lacked the physical and mental ability to make and communicate a decision about whether she agreed to the sexual conduct.

*4. Effect of alcohol induced fragmentary blackout*

In support of its argument that Cpl Alpha lacked the mental capability to communicate a decision about consent to the attempted act of oral sex and the acts of sexual contact, the Government notes that Cpl Alpha was "in and out"[115] and testified that she did not realize Appellant was performing oral sex on her until she looked down and saw him.[116] Additionally, Cpl Alpha

---

[112] We also question whether Appellant's acts (pulling down his shorts and using his hands to turn her head, but desisting after she turned her head away a second time) apparently would have resulted in the commission of the offense *but for* Cpl Alpha's act of turning her head away, which prevented completion of the offense.

[113] Appellee's Answer at 20.

[114] *Id.* at 21.

[115] Corporal Alpha described this as "there [were] moments that I was sleeping that I was just—my eyes were closed and I was just trying to sleep." Record at 456.

[116] Appellee's Answer at 19.

testified she believed she fell asleep while Appellant was penetrating her while he was on top of her.

Corporal Alpha's testimony is consistent with a fragmentary blackout. The Defense expert testified that it is common for persons experiencing a blackout to believe that they fell asleep or were unconscious when in fact they simply lack memory for the event. He also testified that "people don't remember falling asleep."[117] Based on this testimony, we do not interpret, beyond a reasonable doubt, Cpl Alpha's feeling of being "in and out" to mean she was actually asleep or losing consciousness.

As relates to the offenses of which Appellant was convicted, Cpl Alpha *does* have memories of those acts, and the memories to which she testified reveal that she could appreciate the sexual conduct at issue and make and communicate a decision about whether she agreed.

### 5. The Government's additional arguments

The Government argues that Cpl Alpha's "retrospective understanding of the nature of the conduct, after several hours of sobering up, does not undermine her inability to appreciate the sexual conduct at the time."[118] They cite *United States v. Robinson*[119] for this proposition. In *Robinson,* the CAAF assessed a legal sufficiency challenge alleging there was insufficient evidence to prove Robinson knew or should have known that the victim was incapable of consenting. Using the legal sufficiency standard, the court viewed the evidence in the light most favorable to the prosecution and affirmed the conviction.[120] *Robinson* is distinguishable from this case. First, *Robinson* involved a challenge to a different element—the appellant's knowledge, not the victim's state.[121] Second, the victim in *Robinson* had no awareness the

---

[117] Record at 761.

[118] Appellee's Answer at 22.

[119] 77 M.J. 294 (C.A.A.F. 2018) (affirming Appellant's conviction as legally sufficient because Appellant knew or reasonably should have known the victim was incapable of consenting).

[120] *See id.* at 297. The majority concluded that the evidence was legally sufficient to prove Appellant's knowledge because: the victim was apparently intoxicated, had stumbled, slurred her speech, and drove recklessly. Moreover, Robinson admitted to investigators that the victim was "probably too intoxicated to consent" to sex. *Id.* at 298.

[121] Robinson did not challenge the legal sufficiency of proof on the element that the victim was incapable of consenting, therefore the CAAF did not specifically

sexual act was occurring until after it had already begun. Not so here. At each juncture of the offenses of which Appellant was convicted, Cpl Alpha's testimony reveals she had the cognitive ability to appreciate what sexual act or contact Appellant sought or began, at the time they were happening. We find *Robinson* factually distinguishable, and it does not change our view of the lack of factual sufficiency in this case.[122] Likewise, we find this case distinguishable from the facts in *United States v. Mannan*[123] and *United States v. Khoi Pham.*[124] In *Mannan*, the Army Court of Criminal Appeals rejected Mannan's argument that his victim was capable of consenting. In that case, the victim did not realize that Mannan was penetrating her vagina (digitally, then with his penis) until each penetration was already occurring.[125] The court found that the victim's later realization of the acts and capacity to communicate did not change the fact that Mannan first penetrated her when she lacked capacity, satisfying the elements of the offense upon penetration. In *Khoi Pham,* the victim was not aware that the appellant had penetrated her. She gained awareness during the act, while the appellant was already penetrating her.

This Court's published case of *United States v. Solis*[126] is also distinguishable. In *Solis,* the victim felt anesthetized by a combination of medical grade marijuana and liquor, fell asleep on a couch, then "came to" with a "slow return of her senses" on a bed, having no memory of having moved, while Solis was already penetrating her.[127]

---

discuss that element. However, even on this element *Robinson* is factually distinguishable from this case because the victim in *Robinson* was unaware she was being penetrated until it was already happening. Her first memory of Robinson being in her room was that he was on top of her, penetrating her.

[122] Nevertheless, we view *Robinson* as an example of our superior court's view of the *Pease* standard. Our conclusion in this case is not inconsistent with *Robinson*.

[123] 2019 CCA LEXIS 169, No. 20170096 (A. Ct. Crim. App. Apr. 11, 2019) (unpub. op.).

[124] 2018 CCA LEXIS 117, No. 201600313 (N-M. Ct. Crim. App. Mar. 8, 2018) (unpub. op.).

[125] We further note that we are not bound by a sister service court's factual determination, as the review for factual sufficiency pursuant to Article 66, UCMJ, is a case-specific de novo review by the assigned panel.

[126] 75 M.J. 759 (N-M. Ct. Crim. App. 2016).

[127] *Id.* at 764-65.

This case is different. Corporal Alpha was aware of what was happening and displayed she was capable of communication before or as each act was happening, although she testified she believed she *fell asleep* during the last act of intercourse.[128]

On the facts as relayed by Cpl Alpha, and taking into account the fact that the trial court saw and heard the witnesses,[129] we are not convinced beyond a reasonable doubt that Appellant is guilty of the offenses of which he was convicted. Accordingly, it is our duty to reverse these convictions.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings of guilt are not factually sufficient. Accordingly, the findings and sentence are **SET ASIDE**. Charge I, Specification 2 and Charge II, Specifications 2 and 4 are **DISMISSED WITH PREJUDICE.**

Senior Judge STEPHENS and Judge LAWRENCE concur.

---

[128] Appellant was acquitted of this offense. Even if Cpl Alpha fell asleep, her later action cannot inform his knowledge at an earlier point in time.

[129] *Washington*, 57 M.J. at 399.

STEPHENS, Senior Judge (concurring):

I join in the Court's opinion without reservation. This Court is aware that in determining factual sufficiency under Article 66, Uniform Code of Military Justice [UCMJ], we are "limited to the evidence presented at trial."[1] We have done just that, and only that, in finding a lack of factual sufficiency. Nonetheless, we are still charged with reviewing the "entire record."[2] In doing so, I note the Article 32 Preliminary Hearing Officer [PHO] concluded in his report to the convening authority [CA] that the specifications for which Appellant was eventually found guilty lacked probable cause.[3] I write separately to remind trial counsel about their ethical duties concerning probable cause and to express concerns about the Article 32, UCMJ, Preliminary Hearing process.

There is nothing in the record suggesting any of the trial counsel personally believed these specifications lacked probable cause or acted unethically. However, all trial counsel should be reminded of their duty under our Rules of Professional Conduct as found in JAG Instruction 5803.1E.[4] Under Rule 3.8.a(1), "Special Responsibilities of a Trial Counsel and Other Government Counsel," a trial counsel "*shall* recommend to the convening authority that any charge or specification not supported by probable cause be withdrawn." Given this Rule, the trial counsel must have believed these specifications were supported by probable cause. But a PHO's recommendation that a specification lacks probable cause should give the trial counsel pause. Trial counsel must be more concerned with diligently investigating, preparing, and presenting the Government's case rather than merely winning. Junior counsel can be assured that opposing counsel, supervisors, convening authorities, and military judges will more readily note the skill and fairness in how a case is tried than the result.

---

[1] *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007).

[2] Art. 66(d) (1), UCMJ (2019) (emphasis added). *See United States v. Jessie*, ___ M.J. ___, No. 19-0192, 2020 CAAF LEXIS 188 at *8 (C.A.A.F. Apr. 6, 2020).

[3] Art. 32, Preliminary Hearing Officer's [PHO] Report at 2.

[4] JAGINST 5803.1E (Jan. 20, 2015). Civilian prosecutors have a similar, but not identical, rule. *See* American Bar Association, Model Rules of Professional Conduct, Rule 3.8: Special Responsibilities of a Prosecutor. "The prosecutor in a criminal case shall . . . refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."

The current Article 32 Preliminary Hearing process leaves open the possibility for future courts-martial to have similar outcomes to this case. One of the stated purposes of the Preliminary Hearing is for an "impartial hearing officer" to determine "whether or not there is probable cause to believe that the accused committed the offense charged."[5] Of course, this determination is really just an advisory opinion and is not binding on the convening authority.[6] But this process ought to serve as some check against service members facing felony-level charges that lack probable cause.

Service members understand the nature of their profession means some fundamental rights will be curtailed for the purposes of promoting good order and discipline.[7] The Fifth Amendment to the Constitution makes clear that one of those curtailed rights is the right to a grand jury.[8] The right to a grand jury traces its origins to Magna Carta, and even before.[9] Despite the popular quip that a grand jury could "indict a ham sandwich,"[10] it seems a matter of fundamental fairness that Americans–even service members—are entitled to some "primary security . . . against hasty, malicious and oppressive persecution . . . to determine whether a charge is founded upon reason or was dictated by an intimidating power."[11] Just as service members are told a

---

[5] Art. 32(a)(1)(A), 32(a)(2)(B), UCMJ.

[6] *See United States v. Meador*, 75 M.J. 682, 683 (C.G. Ct. Crim. App. 2016) ("There is nothing in this statutory scheme that makes a determination of probable cause by the PHO a precondition of referral to a general court-martial, nor is there any language making the PHO's determination binding on the SJA [staff judge advocate] or the CA.").

[7] *See, e.g., Parker v. Levy*, 417 U.S. 733, 758, 770 (1974) (Army doctor's First Amendment rights not violated when prosecuted for statements urging black enlisted soldiers to refuse to serve in Vietnam due to Army's racial bigotry, and for claiming Special Forces personnel are "liars and thieves and killers of peasants and murderers of women and children.").

[8] U.S. Const. amend. V.

[9] Magna Carta, Arts. 18, 19 (1215). *See also* Assize of Clarendon (1166), *in* 5 *The Founders' Constitution* 246 (Philip B. Kurland & Ralph Lerner eds., 1987).

[10] In January 1985, Sol Wachtler, the Chief Judge of the New York Court of Appeals told the New York Daily News, district attorneys have so much influence on grand juries that "by and large" they could get them to "indict a ham sandwich." This quip was popularized in Tom Wolfe's 1987 novel "The Bonfire of the Vanities." Judge Wachtler was later himself indicted and convicted for extortion.

[11] *Wood v. Georgia*, 370 U.S. 375, 390 (1962). Though the Supreme Court has held that a grand jury is not, by itself, a requirement of fundamental due process and has

members panel is the worthy substitute to the Sixth Amendment right to a jury,[12] they are provided an Article 32 Preliminary Hearing as a worthy substitute to what may even be the minimal rigor of a grand jury. But was it here?

In his report, the PHO stated these specifications lacked probable cause because, "[t]he exhibits show that alcohol did not inhibit [Cpl Alpha's] ability to express non-consent to the accused's actions."[13] But the SJA opined the PHO was wrong because Cpl Alpha was "heavily intoxicated and vomited prior to leaving the bar" and that she was "heavily intoxicated during sexual acts and that she was not coherent during those acts."[14] It appears the SJA erroneously focused on the alcohol and the intoxication levels rather than the applicable legal standard enunciated by our superior court. The SJA makes no mention or discussion of *United States v. Pease*,[15] the case that most clearly defines and discusses what it means to be "incapable of consenting" and "able to make or communicate a decision." This was a significant oversight. The evidence showed Cpl Alpha was coherent and the PHO stated that she was able to communicate her decision about whether she wanted to participate. For what it is worth, I also believe these specifications lacked probable cause from the outset.[16] This Preliminary Hearing, at least with respect to these specifications, provided no meaningful protection for Appellant and no check on the Government's ability to expose him to felony-level punishment.

A PHO's recommendation that a specification lacks probable cause should be met with serious analysis. This is perhaps especially true in an alcohol-facilitated sexual assault case where the charging theory is incapacity to

---

not incorporated it against the States, *Hurtado v. California*, 110 U.S. 516 (1884), all States use either a grand jury or some type of preliminary hearing to determine probable cause for felonies.

[12] *Reid v. Covert*, 354 U.S. 1, 37 n.68 (1957).

[13] Art. 32, PHO Report at 2. I do not address the PHO's lack of detail in his report. On one hand, the lack of probable cause for the specifications seems apparent from the evidence. But a more rigorous analysis than just some minimal remarks on the DD-457 form might have persuaded the SJA and resulted in these specifications not being included in the referral to general court-martial.

[14] Article 34, UCMJ, Pretrial Advice Letter, dtd 9 May 2018 at 1.

[15] 75 M.J. 180 (C.A.A.F. 2016).

[16] I again stress that this Court concluded a lack of factual sufficiency prior to and separate from any consideration of probable cause or lack thereof.

consent due to impairment by intoxicant. The overwhelming majority of Marine Corps and Navy adult sexual assault cases feature some level of intoxication. But trial counsel and SJAs should be wary of presuming that every sexual assault involving alcohol gives rise to probable cause for a sexual assault based on incapacity due to intoxication. Here, even if we assumed *arguendo* that these specifications were supported by probable cause, it would have been by a razor-thin margin at best. Failure to closely scrutinize the merits of charging every theory no matter its strength can jeopardize the case as a whole.

A conviction by the members on the alternate bodily harm theory was well within the realm of possibility. One wonders if these convictions resulted because the presence of alcohol overshadowed the Government's alternate theory. And now we are required to reverse the convictions on the specifications which, I believe, should not have been referred at all. If the Government had taken the PHO's determination seriously–or Article 32's purported *raison d'etre* of determining probable cause was taken seriously–there might be a very different outcome to this case.

Specifications lacking probable cause should not find a home on referred charge sheets for general courts-martial.[17] Congress empowered our PHOs to collect and review all relevant information and to make a recommendation regarding probable cause. Commanders and their SJAs ignore these opinions at their peril.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[17] I also express concern that the military judge did not *sua sponte* enter a finding of not guilty under R.C.M. 917 for these specifications and that the trial defense counsel did not make such a motion.

4